## Case No. 14,079.

### TOLER v. WHITE.

[1 Ware (277), 280; [1] 19 Am. Jur. 206.]

District Court, D. Maine. Dec. 22, 1834.

SHIPPING—PUBLIC REGULATIONS—DEPOSIT OF PAPERS WITH CONSUL.

The act of February 28, 1803, § 2 [2 Stat. 203], concerning consuls and vice-consuls requiring masters of vessels to deposit their ship's papers with the consul on their arrival in a foreign port, does not apply to a case when the vessel merely touches at a port, without coming to an entry or transacting any business.

[Cited in Parsons v. Hunter, Case No. 10,778; Passenger Cases, 7 How. (48 U. S.) 537; Harrison v Vose, 9 How. (50 U. S.) 384; The Javirena, 14 C. C. A. 350, 67 Fed. 155.]

This action was brought by the United States, in the name of [Hopeful Toler] their consul at Ponce, in Porto Rico, to recover a penalty of $500, of the defendant [John White], master of the brig Cadmus, of Kennebunk-port, for not depositing his register with the said consul, on his arrival at Ponce, agreeably to the requirement of the statute of February 28, 1803, § 2. It appeared by the evidence that Capt. White arrived at Ponce, in Porto Rico, in the brig Cadmus, the first of March, 1834, between the hours of six and seven o'clock in the morning, and came to anchor; that he went on shore in the course of the day, and passed by the consul's office, and that the vessel remained in port until about five o'clock in the afternoon of the same day, when she got under weigh and left, without having deposited her papers with the consul.

Mr. Anderson, Dist. Atty., for plaintiff.
G. W. Pierce, for defendant.

WARE, District Judge. [2] [The admission of the consul's certificate as evidence is objected to in the first place because he is a

[1] [Reported by Hon. Ashur Ware, District Judge.]
[2] [From 19 Am. Jur. 206.]

party in the case. The general rule is that a person whose name appears as a party on the record cannot be heard as a witness to support his own cause. The reason is that he is directly interested in the event of the suit, either from having an immediate interest in the matter in controversy, and therefore obtaining a certain benefit or loss, as the decision may be either in his favor or against him, or from his liability to cost in the event of an adverse decision. This is the sole reason for his exclusion, and the rule by which he is excluded, extends no farther than the reason on which it is founded. When, therefore, he has no interest in the subject in controversy, and is not liable for costs, whatever may be the decision, he is like any other disinterested person a competent witness. On this distinction the members of charitable corporations have been held to be competent witnesses for the corporation, they not being personally interested in the suit nor liable for costs (Weller v. Governors of Foundling Hospital, Peake, 153); and for the same reason it was ruled by Judge Washington, in Willings v. Consequa [Case No. 17,767], that a party who had assigned to his co-plaintiff's all his interest in the matter in controversy, and had been indemnified by them against costs by a deposit with the clerk, of a sum sufficient to cover the costs already arisen and those which probably would arise, was a competent witness for his co-plaintiffs, though his name stood on the record as a party to the cause. The interest which a party has, says Mr. Justice Washington, in the event of the suit, both as to costs and the subject in dispute, is the reason why he cannot be a witness; and when that interest is removed the objection ceases. In this case the suit is directed by the statute to be prosecuted in the name of the consul. But it is commenced by the order of the United States, it is prosecuted for their benefit and by their attorney, and the penalty when recovered is recovered for their use. The consul's name is used instead of that of the United States, the real plaintiff, as the postmaster-general stands on the record as the nominal plaintiff, in all suits commenced for debts due to the post office. The consul has no interest in the subject in controversy, and no control over the action. He is a mere nominal plaintiff and is not, as I understand the law, liable for costs, in the event that the decision is against him. The objection to the admissibility of the certificate on the ground that the consul is a party on the record cannot be sustained. It is further objected that the evidence is taken ex parte. The answer to this objection is that it is taken by neither party in the proper sense of the word, unless the consul should be considered in this act as the representative of the United States. The evidence comes from a public officer in the regular discharge of the proper functions of his office, and as a part of his regular and ordinary official duty. It cannot therefore with propriety be termed ex parte evidence.

[Another objection is that it is not under oath. It is true that the certificate is not confirmed by the oath of the consul. But it cannot be considered as wholly unprovided with the sanction of an oath. In giving the certificate he acts as a public officer within the proper sphere of his official duty, and though the attestation of his oath is not given directly to the certificate, it is made under the obligation of his oath of office. There are many cases in which the certificate of a public officer, acting within the range of his official duty, is received as evidence without being verified by the oath of the officer. Indeed they are not thus usually verified. But this is not admitting evidence unsupported by oath. The official oath of the officer applies to the certificate, and is binding on the officer in giving it, as far as an oath can bind. The violation of truth is not in such cases, indeed, usually visited with the penalties of perjury, but is punished as an official misdemeanor. But it is not on that account the less perjury in the forum of conscience. The return of an officer on a precept of court is received as evidence, but it is not sworn to. A copy of a record, certified under the official seal of the recording officer, is not verified by any other oath than his oath of office. Yet this is admitted in evidence and is of higher authority than an examined copy which is sworn to by any other person. Bull. N. P. 226.

[But though these objections are not conclusive against the admissibility of the certificate, the question still recurs, is it competent evidence? As it does not present itself in a form, which entitles it to be received according to the ordinary rules of courts of law, it belongs to him who offers it to shew, that it is within some principle, that takes it out of the ordinary rule, by which papers of this kind are excluded from the character of evidence. No decision directly in point has been referred to in the argument. I have met with none in my own researches. Yet it can hardly be doubted that this precise question must have occurred in the practice of the courts. In deciding the question, then, we must recur to general principles.

[A consul holds a high and responsible office. The original object of the institution of the office was purely commercial, it being the consul's duty to watch over and protect the commercial rights of his country, within the limits of his consulate. This is a general duty, which it is believed results from the nature of his office. But there are some particular duties, which are specifically required of him by the laws of this country, and one of them is that mentioned in the section of the law on which this action is founded, viz., that of receiving the papers of all American vessels arriving at the port where he resides.

The receiving of the register of a vessel is an official act done in discharging the ordinary functions of his office. He is therefore the proper person to be called upon to prove, whether it was deposited with him or not; and if it was not, he is the only person by whom this fact can be proved. It would seem, therefore, that he must be a competent witness, from the necessity of the case, and the only question which can be raised, is, whether his testimony must be under oath. I think it is not necessary; but that the authentication of the certificate, by the seal of the consulate, is equivalent to a verification of it by the oath of the party. It is not contended that the annexation of the seal of the consulate to every certificate will make it evidence. It is only when he certifies a fact, which falls within his official cognisance, in the regular discharge of the duties of his office. Why should not his certificate, authenticated under the seal of the consulate, have the same credit as the certificate of the clerk under the seal of the court? In the case of Church v. Hubbart, 2 Cranch [6 U. S.] 187, the certificate of the American consul at Lisbon was offered to prove a law of Portugal. It was annexed to a copy of a translation of the law certifying that the copy was a true one and that the translation was correct. It was adjudged to be inadmissible as evidence. The chief justice, in delivering the opinion of the court, observed, that to give this certificate the force of testimony, it would be necessary to show, that it was one of the consular functions, to which the laws of this country attach credit. The certificate in that case was an extra-official act. The American consuls have not the custody of foreign laws, and can give no copies of them. But in the present case, it is made the duty of the master to deposit his register with the consul, and the consul receives it in his official character. It is a matter which falls within his official cognizance, and, in making a certificate of the fact, he is performing one of the regular and ordinary functions of his office. My opinion on the whole is, that the certificate is evidence of the fact which it certifies.

[A question still remains, is it evidence of any thing more than the naked fact of the non-delivery of the register? It appears to me that it must be allowed the effect of prima facie evidence of the arrival of the vessel. This is indeed a fact which may be proved by other witnesses; but it is the consul's duty to see that our laws are observed by masters of vessels visiting the port where he resides. The fact of the arrival, connected with the non-delivery of the register, seems properly proved by the consular certificate.

[The certificate of the consul having been admitted to be read as evidence, it appeared therefrom, that Captain White arrived at Ponce, in Porto Rico, in the brig Cadmus, the first of March, 1834, between the hours of six and seven o'clock in the morning, and came to anchor; that he went on shore in the course of the day and passed by the consul's office, and that the vessel remained in port until about five o'clock in the afternoon of the same day, when she got under weigh and left, without having deposited her papers with the consul.] [3]

A number of ship masters were examined to show what had been the practice of masters, as to depositing their papers with the consul. The evidence related principally, but not exclusively, to the usage in the ports of the West Indies. It appeared that, for many years after the passage of the act, it was not the custom of masters to deposit their papers with the consul, except at the ports where they came to an entry and transacted business, and not always in those cases; but that the usage was general, not to deposit their papers with the consul at a port where they merely touched to try the market, or for information, although they might be required to pay some small port charges, as anchorage, &c.; but that within a few years, the consuls in some of the West India ports had required the deposits of the ship's papers, in all cases where the vessel came into port, whether she came to an entry and transacted any business, or not; that the demand of the consuls had in some instances been complied with, but had more generally been resisted. It was also proved that it was a common practice in this trade, for vessels to touch at one or more ports, for the purpose of ascertaining the state of the market, or to learn at what place they could dispose of their cargo most advantageously.

The case was then argued by the gentlemen above-mentioned, and was submitted to the decision of the court, on the law and evidence, the right being reserved to each party to sue out a writ of error, as on a judgment rendered on a verdict.

[The following opinion was subsequently delivered by WARE, District Judge:] [4]

This is a suit for a penalty, brought on the act of February 28, 1803, supplementary to the act of April 14, 1792 [1 Stat. 254], concerning consuls and vice-consuls. The 2d section of the act provides, that it shall be the duty of every master or commander of a ship or vessel belonging to citizens of the United States, who shall sail from any port of the United States after May next, on his arrival at a foreign port, to deposit his register, sea letter, and Mediterranean passport, with the consul, vice-consul, commercial agent, or vice-commercial agent, if any there be at such port, and that in case of refusal or neglect of the said master or commander to deposit the said papers as aforesaid, he shall forfeit and pay five hundred dollars, to be recovered by the said consul, vice-consul, commercial agent, or vice-commercial agent, in his own name, for the benefit of the

---

[3] [From 19 Am. Jur. 206.]

United States, in any court of competent jurisdiction.

It is contended by the counsel for the plaintiff, that by the true construction of the act, the master is bound in all cases to deliver the papers of his ship to the consul whenever he goes into port and comes to anchor, whether he makes an entry at the custom-house and transacts any business in the port, or not, and whether he remains there a longer or shorter time; that the words of the statute being general, and without qualification, that the master shall, on his arrival, deposit his papers, the court cannot interpose an exception which is not found in the law. On the part of the defendant, it is contended that the master is never bound to deposit his papers, except at a port where he comes to an entry at the custom-house, and that such has been the general understanding with respect to the law among masters of vessels and mercantile men.

The evidence which has been offered to show what has been the usage under the law, may be disposed of by one or two general observations. It cannot be pretended that usage alone can abrogate a positive act of the legislature. Customary law, or that which rests on no other foundation than usage may be abrogated by a contrary usage. As it derives its whole authority from the silent assent of those who are affected by it, its obligatory force may be annulled in the same way, by the silent adoption of a contrary usage. But an act of the legislature can be annulled only by the same authority by which it was made. If it was then shown by satisfactory evidence that the law had not been observed, this would not prove that it is not in force, and obligatory in those cases to which it applies. U. S. v. Lyman [Case No. 15,647].

But the practice under the law has been urged in another view, as showing the sense in which it was understood at the time, and immediately after it was made, by those to whom it applies, and who had an agency in carrying it into execution, and as having something like the force of a contemporaneous construction of the act. It may be admitted that usage may, in some cases, throw light on the meaning of a statute, when its language is ambiguous, and may fairly admit of two constructions. But usage, to be urged with effect for this purpose, must be consistent with the words of the act, although they may be susceptible of a different meaning. To admit that it can authorize a construction against the plain and evident meaning of the words, is to admit that usage can repeal a statute. The custom must also be general and uniform. Now the evidence in this case relates almost entirely to a particular trade, the trade in the ports of the West Indies; and a part of the evidence proves too much, for it shows that a practice has prevailed

to some extent directly in conflict with the words of the law, not to deposit the ship's papers with the consul at all, even in the port where she has discharged her cargo and taken in a new one. The evidence does not prove such a general and uniform usage as can safely be relied upon as an index even to the opinions of mercantile men, as to the meaning of the law; much less such an usage as a court can receive as having the authority of a contemporaneous exposition of the statute.

We must then return to the statute itself, and expound it by its own words, and by other acts of the legislature relating to the same general subject. The difficulty lies in determining the precise import of the word "arrival," as it is used in this section. The common and obvious meaning of the word, is, coming to some port or place. But in the fiscal and navigation laws of the United States, it is not always, perhaps not most generally, used in its original and etymological meaning, nor is it invariably used in one and the same sense, so that what is deemed by law to be an arrival for one purpose, is not deemed to be so for another. In the 25th, and some of the following sections of the collection law,—act 1799, c. 128 [1 Story's Laws, 595; 1 Stat. 646, c. 22],—the word is used in its common and most comprehensive signification. Every master of a vessel coming from a foreign port is directed, on his arrival within four leagues of the coast—or within the limits of any collection district, to exhibit the manifest of his cargo to the first officer of the customs who comes on board his vessel. The sense in which the word is used here, is that of coming within four leagues of the coast, or within the limits of a district. The third section of the coasting act, February 18, 1793 [1 Stat. 306], authorizes vessels in certain cases, when in a district to which they do not belong, to change their papers and take out a temporary register or license, which they are required, within ten days after their arrival within the district to which they belong, to surrender and take out new papers. In the case of U. S. v. Shackford [Cases Nos. 16,262 and 16,263], which arose in this district, it was decided that the penalty under this section was not incurred by a vessel touching at a port in her home district, coming to anchor, and landing passengers in the course of a voyage to another port; but that to constitute an arrival, within the meaning of this section, it must be an arrival in the regular course of her employment, at a port of destination within her home district. The casual touching at such port, for purposes not connected with the objects of the voyage, was not such an arrival as was contemplated by this section of the act. The word is evidently used in the same restricted sense in the 14th section of the registry act. Act Dec. 31, 1792 [1 Stat. 294]. In both

these sections nearly the same form of expression is used, as in the 25th section of the collection act, in which it is quite clear that merely coming within four leagues of the coast, or within the limits of a district, is an arrival within the meaning of the legislature; and in the other acts referred to, it is clear that a mere coming within the district is not such an arrival as is contemplated, and as makes it necessary for a vessel to change her papers. By the 15th and 17th sections of the coasting act, the master of a vessel arriving at a district, from another district, is required in certain cases to deliver a manifest of his cargo to the collector. The context clearly shows, that arrival, in these sections, means an arrival at a port of destination, where the cargo, or a part of it, is intended to be delivered. The 22d section of this act relates to vessels "putting into a port other than that to which they are bound," which, in the subsequent part of the section, is called an arrival. Here the word is used for the touching at a port for purposes disconnected with the principal objects of the voyage.

It being then clear that the word is used in the revenue and navigation laws of the country in different senses; for merely coming to a place or port—for putting into or touching at a port, not for the purposes of trade, but from necessity or any other cause, as well as for an arrival at a port of destination; whether in a given case the legislature intended one or another of these meanings, must be determined from the connection in which it is used, and the objects intended to be effected by the law. One of the objects of this requirement, as stated by the district attorney, is to prevent the use of simulated American papers, by vessels which are not entitled to them; and he referred to a communication of the executive to congress, in 1797, urging the subject upon the attention of congress, in this view. In time of war, the temptation to the merchants of the belligerents is very strong to screen their vessels from capture, by giving them a neutral character; and it is known as an historical fact, that during the late European wars, the practice of fabricating American papers for vessels belonging to the belligerents was carried to a very great extent. The consequences were extremely embarrassing and vexatious to our commerce. The American flag became everywhere suspected of covering enemies' property: and our own vessels, in consequence of this suspicion, were subjected to great embarrassments, and our merchants to heavy losses. The interests of our commerce were at that time deeply concerned in suppressing this abuse. And in peace, as well as in war, both the honor and interest of the country require that the rights of our flag should not be usurped by those who are not entitled to them. When nations have granted to our commerce particular privileges by treaty, good faith as well as the public interest demands of our government to prevent others from fraudulently obtaining the same privileges, by the use of simulated American papers. These frauds may be checked to a very great extent, or made very hazardous to those who perpetrate them, by requiring masters of vessels, in all cases, on arriving in a foreign port, to deposit their papers with a public officer, who may be provided with the means of distinguishing the genuine from spurious and forged papers or documents. But besides motives of this kind, the government have an interest in knowing whether our vessels habitually carry with them, when abroad, the proper documentary proof of their American character.

The mercantile classes of the community have a deeper interest than any other in having this law so enforced as to attain rather than frustrate the objects intended to be effected by it;—and, on the other hand, it cannot be supposed that the legislature intended such a construction as should produce unnecessary embarrassments to trade. The provisions of the law were doubtless intended as a benefit and security, and not as a burden to the commerce of the country. Now the evidence in this case shows that it is common for vessels to clear out for a particular port or island and a market, and if the evidence which was objected to by the counsel for the plaintiff, is not properly admissible, I know not but the court may judicially take notice of a fact of so frequent occurrence and so well known. In those cases they often touch at one or more ports for information, before they find a market that suits them, and usually they only stop long enough for the master to go on shore and call on a merchant;—sometimes the vessel goes into port and comes to anchor, and sometimes she lies off and on without coming into port; in some cases there are small port charges to be paid, and in some cases there are none. The object of the master is to obtain information with the least delay practicable, and if the market does not suit him, to proceed to another port. To require him, in these cases, to part with his vessel's papers, might be attended with serious inconvenience. Besides the increased delay it would occasion, and every delay in maritime commerce is to be regarded as a source of increased danger, his vessel, while lying off a port, might, by a sudden change of wind, be driven to sea without papers. A construction of the law which would produce such inconvenience, ought not to be adopted, unless such appears evidently to have been the intention of the legislature. The district attorney makes here a distinction, and holds that a master is not required to part with his papers unless his vessel come to anchor. But the words of the law make no such distinction, and if we adopt the strict meaning of

the word in this section, the coming to anchor is no part of the arrival. This is complete before her anchor is cast.

It does not appear to me that the policy of the law requires this construction, and it seems that all the objects intended to be attained by it, may be had by an interpretation less onerous to commerce. And I think the words of the law, also, point to a different construction. The term "deposit," carries with it the idea of something more than the mere delivery of the papers to the consul, for inspection, to be redelivered in a few hours. This word is not usually employed, except when the thing is intended to remain with the depositary for some time, and when the deposit is made for some specific object, beyond that of mere inspection or examination. The subsequent words of the statute go to confirm the idea, that this term is here used in its common and most usual sense. After directing the master to deposit his ship's papers with the consul, the law proceeds to direct the consul in whose custody they are deposited, on "the master's producing a clearance from the proper officer of the port, where his ship or vessel may be, to deliver to said master all his said papers." The natural inference from this language is, that the legislature intended that the ship's papers should remain in the custody of the consul, while the ship remained in port. And it may be inferred with a yet higher degree of probability, that the cases which were in the contemplation of the legislature, as falling within the provisions of the law, were those of vessels coming to an entry at the custom-house, and engaging in trade, where they would necessarily be detained a considerable time. For when a vessel merely touches at a port for a few hours, and engages in no trade, she does not ordinarily make an entry at the custom-house, and of course does not take a clearance. If the cases of vessels merely touching at a port for information, without engaging in trade, had been within the contemplation of the legislature, as comprehended within the requirements of this section, they would not have directed the consul to redeliver the ship's papers to the master, on his producing a clearance, but to deliver them whenever the vessel was ready to depart; at least, that or some other equivalent expression would have been much more natural, and more consistent with such an intention than that actually used. The inference is therefore strong, from the language of the law, that such a case as the present does not come within its meaning, and of course that the master has not incurred the penalty. On the whole, whether we look to the policy and objects of the law, or to its words, we are, I think, brought to the same conclusion, that when a vessel merely touches at a port without making an entry at the custom-house, or transacting any business, and stops but a few hours, the master is not bound to deposit his ship's papers with the consul. The natural inference from the language of the act is, that the deposit is only required when an entry is made, and the word "arrival," in this section of the law, means an arrival at a port of destination; but there may, perhaps, be other cases to which this act will apply. It will, however, be in season to decide those cases when they are presented.

According to the agreement of the parties, judgment must be rendered for the defendant.

NOTE [from original report in 19 Am. Jur. 206]. A writ of error was afterwards brought to the circuit court, on the foregoing decision, and was dismissed. The several questions discussed in this case are also examined in the cases of Levy v. Burley [Case No. 8,300], and Parsons v. Hunter [Id. 10,778], in which Mr. Justice Story dissents, in some points, from the opinion above expressed by Judge Ware.